Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 5835 | **DATE** | 4/25/2011 |
| **CASE TITLE** | Bjornson vs. Astrue | | |

**DOCKET ENTRY TEXT**

Motion by Plaintiff Christine Bjornson for summary judgment [7] is denied; cross-motion for summary judgment by Defendant Michael Astrue [15] is granted. Status hearing set for 5/6/11 is vacated.

■[ For further details see text below.]

Docketing to mail notices.
*Mail AO 450 form.

# STATEMENT

On December 12, 2007, Christine Bjornson ("Bjornson") applied for disability insurance benefits ("DIB") under the Social Security Act ("SSA" or "the Act"). She claimed to be suffering from back pain and headaches, alleging an onset date of February 2, 2002. Because Bjornson was insured through June 30, 2005, and because a DIB claimant must prove that she was disabled on or before the date her insured status expired, see 42 U.S.C. §§ 416, 423, the ALJ's analysis focused on whether she was disabled prior to June 30, 2005. The ALJ concluded that during the period between February 2, 2002 and June 30, 2005, Bjornson had several severe impairments: degenerative disc disease; chronic pain syndrome; and residuals of Chiari malformation surgery, including headaches. R. at 18. However, the ALJ concluded that Bjornson did not have an impairment or combination of impairments that met or was equivalent to one of the impairments listed in the SSA. The ALJ concluded that Bjornson had the ability to perform sedentary work with an option to sit or stand while working; however, she was restricted from work requiring concentrated exposure to extremes of temperature or humidity, since these conditions exacerbated her headaches. After the ALJ's decision was affirmed by the Appeals Council, Bjornson filed the instant suit, claiming that the ALJ erred in concluding that she was not disabled and in denying her application for DIB. Presently before me are the Commissioner's and Bjornson's cross-motions for summary judgment. For the reasons explained below, the Commissioner's motion is granted and Bjornson's motion is denied.

Under § 405(g), the court's review is limited to determining "whether the final decision of the Secretary is both supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence" means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon*, 270 F.3d at 1176.

Bjornson first takes issue with the ALJ's negative assessment of her credibility. She focuses in particular on the ALJ's conclusion that the record did not support her claims regarding the frequency and severity of her headaches. While the ALJ found sufficient evidence that Bjornson suffered from debilitating headaches prior to September 2003, he found that her "subsequent complaints of headache symptoms were relatively infrequent." R. at 22.

Bjornson claims that even after 2003, she continued frequently to complain of headaches. However, the ALJ's finding that Bjornson only occasionally complained of headaches is supported by substantial evidence in the record. Indeed, it is supported by the statement of Dr. Goodman, Bjonson's pain specialist, who stated that Bjornson "would refer to these headaches from time to time during her treatment with me." R. at 660. The ALJ reasonably understood Dr. Goodman's use of the expression "from time to time," to mean "occasionally." It should also be noted that the ALJ's assessment of the severity of Bjornson's headaches was based not only on the frequency of the headaches, but also their intensity. Even if Bjornson continued to regularly have headaches, there was substantial evidence that after 2003, the episodes no longer had the same limiting effect. For example, Bjornson was examined by neurologist Dr. Anthony DiGianfilippo in 2008, who reported that Bjornson had said that she was able to deal with her headaches and that she was more concerned with pain in her back and leg. R. at 622. Similarly, medical expert Dr. Chukwuemeka Ezike testified that there was nothing in the record to suggest that, after 2003, Bjornson's headaches should have prevented her from working. *See, e.g.*, R. at 97.

Bjornson's additional objections to the ALJ's negative assessment of her credibility also fail to persuade. For example, Bjornson contends that the ALJ violated Ruling 96-7p (SSR 96-7p), which provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment." According to Bjornson, the ALJ's assessment of her condition was largely based on the fact that she had complained of headaches less frequently to her doctors after 2003. She maintains that the ALJ failed to take into account her explanation of why the complaints became less frequent -- namely, because Dr. Goodman had informed her that he was unable to treat her for the headaches. But the record does not show that the ALJ ignored her explanation on this point. Nor did the ALJ conclude that Bjornson had "failed to seek or pursue regular medical treatment"; he simply observed that her headache complaints were less frequent after 2003. Bjornson also complains that the ALJ's decision was flawed because he made no assessment of her husband's credibility. Even assuming that this is so, however, it does not undermine the ALJ's opinion. It is well-settled that an ALJ is not required to address every piece of evidence or testimony in the record. *See, e.g.*, *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

Next, Bjornson argues that the ALJ's analysis of Dr. Goodman's opinion was erroneous. She contends that the ALJ failed to take sufficient account of Dr. Goodman's statement that Bjornson "must sit or lie down several times per day to control pain." As Bjornson concedes, the ALJ's opinion notes that Dr. Goodman "observed in October 2007 that the claimant 'must sit or lie down several times per day to control pain.'" R. at 23. Bjornson claims that this is misleading, however, because it suggests that Goodman made this observation on only a single occasion. In point of fact, she insists, Dr. Goodman made the same remark on many occasions. But the fact that the ALJ mentions only a single instance does not show that he failed to consider other occasions on which Goodman made the observation. The ALJ may well have omitted mention of Dr. Goodman's other statements simply to avoid being redundant. It should also be pointed out that the observations of Dr. Goodman to which Bjornson refers were made in 2005, after she was no longer insured. As a result, these statements are only indirectly relevant (if they are relevant at all) to the question whether Bjornson was disabled prior to that time.

Bjornson's third objection to the ALJ's decision is that he allegedly drew conclusions based on a faulty hypothetical that he presented to Vocational Expert ("VE"), Michele Peters, at a hearing on Bjornson's application. Specifically, the ALJ asked Peters whether jobs existed in the national economy "for an individual with the claimant's age, education, work experience, and residual functional capacity." R. at 26. Peters replied that "given all of these factors the individual would have been able to perform the requirements of representative occupations such as an information clerk, with 1,000 representative jobs in the Chicago regional economy; inspector, with 900 jobs; and telephone clerk, with 800 jobs individual would have been able to perform the requirements of representative occupations such as an information clerk, with 1,000 representative jobs in the Chicago regional economy." *Id.* Bjornson claims that the ALJ failed to inform Peters of the fact that, in addition to her headaches, Bjornson also had difficulty paying attention and concentrating on work tasks. As a result, Bjornson asserts, Peters's conclusions were not reliable. Earlier in his opinion, however, the ALJ rejected Bjornson's claims of impaired concentration. *See* ALJ Opinion at 20 ("The third functional area is concentration, persistence or pace. In this area, the claimant had mild limitation. The claimant alleged decreased concentration due to pain management medications, but treatment notes from the office of pain specialist Dr. Goodman indicate that the claimant denied side effects of decreased concentration. (EX 6F, 14F). This limitation, even if present, is not attributable to the claimant's mental impairment."). So long as the ALJ's conclusion regarding Bjornson's alleged attention problems was supported by substantial evidence in the record -- and I hold that it was -- the ALJ's omission of the information from the hypothetical was not erroneous.

Bjornson's last contention is that the ALJ improperly evaluated the opinion of consultative examiner Dr. Muhammad Rafiq. Dr. Rafiq opined that

-3-

during the course of a typical eight-hour workday, Bjornson could occasionally lift and carry up to ten pounds; could sit only for ninety minutes; stand for sixty minutes; and walk for thirty minutes. For the remainder of the workday, Dr. Rafiq stated, Bjornson would need to lie down. The ALJ explained that he was not persuaded by Dr. Rafiq's opinions because Dr. Rafiq never "explain[ed] the near-total limitations" he identified on Bjornson's abilities, and because "those limitations are not supported by his own clinical observations." R. at 24. Due to this lack of support, the ALJ was "left to conclude that Dr. Rafiq relied on collateral evidence" -- in particular, Bjornson's own self-reporting -- in concluding that her functioning was so severely restricted. Bjornson claims that Dr. Rafiq's conclusions are corroborated by Dr. Goodman's determination that Bjornson would need to sit or lie down throughout the day to relieve her pain.

But regardless of whether Dr. Rafiq's conclusions are supported by Dr. Goodman's findings, Rafiq's conclusions were contradicted by Dr. Ezike's. While Dr. Ezike testified that Bjornson was likely disabled from the alleged onset date through 2003, he stated that there was a lack of evidence for such a conclusion after 2003. The ALJ explained that he "assign[ed] substantial weight to Dr. Ezike's opinions, as he is familiar with the Social Security disability program, reviewed all available medical evidence of record, listened to the claimant's testimony regarding her symptoms and functional limitations, and issued opinions consistent with the rest of the medical evidence record." R. at 24. It was the ALJ's prerogative to credit Dr. Ezike's conclusions over Dr. Rafiq's, and his assessment of Dr. Rafiq's opinion was not improper.

For these reasons, the Commissioner's motion for summary judgment is granted and Bjornson's motion is denied.